UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-12436-RGS

PARAFLON INVESTMENTS, LTD.

v.

FULLBRIDGE, INC., PETER OLSON, and CANDICE OLSON

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

August 9, 2019

STEARNS, D.J.

Based on the credible testimony and exhibits offered at trial, and the stipulations of the parties, I make the following findings of fact.

## FINDINGS OF FACT

### *The Parties*

1.      Plaintiff Paraflon Investments, Ltd., is a private limited company with a principal place of business in the British Virgin Islands.  Stipulation of Facts (SOF) (Dkt # 95) ¶ 1.  It is wholly owned by a family trust, *id.*, of which Michael Sarkesian is the ultimate beneficiary, *id.* ¶ 2.  Sarkesian's role is to present investment opportunities to Paraflon.  Tr. Day 1 (Sarkesian) at 38:3-7.

2.     Defendant Fullbridge, Inc., is a Delaware corporation with a principal place of business in Boston, Massachusetts, that provides training to college students, recent graduates, and young professionals to prepare them for the workplace.  SOF ¶ 6.  Defendants Candice and Peter Olson are the founders of Fullbridge and served as its co-Chief Executive Officers (CEOs) from its founding in June of 2010 until August of 2015.  *Id.* ¶ 7; Trial Ex. 163 at 7.  Peter Olson then served as the sole CEO from August of 2015 until his resignation on May 25, 2016.  SOF ¶ 8.

3.     Peter Olson is a graduate of Harvard University, Harvard Law School, and Harvard Business School.  He previously served as chair and CEO of a major publisher, Random House, before becoming a professor at Harvard Business School.  Tr. Day 4 (Mr. Olson) at 31:21-33:18.  Candice Olson is a graduate of Stanford University, Harvard Business School, and Teachers College at Columbia University.  She previously worked at American Express and Time Warner, before serving as a cofounder and CEO of iVillage, Inc.  Tr. Day 3 (Mrs. Olson) at 54:6-57:17.

## *Fullbridge's Work in Saudi Arabia*

4.     Almost from its inception, Fullbridge was starved for cash and struggled to keep up with operating expenses.  As a stopgap, the Olsons

turned to the market for new investors and opportunities to expand Fullbridge's business.  Trial Ex. 163 at 13.

5.      The Olsons succeeded in winning the Kingdom of Saudi Arabia through a royal subsidiary called Takamol[1] as a new client.  Takamol was established by the Saudi Ministry of Labor to educate and train new entrants to the Saudi labor market.  SOF ¶ 17.

6.      On May 5, 2014, Takamol issued a Request for Proposal (RFP), to which Fullbridge responded.  Trial Ex. 192 at 5.  Fullbridge was thereafter notified electronically and verbally that it had been selected to design and implement a training program, under the designation Wave 1.  Mrs. Olson Dep. at 39:11-17.

7.      On August 11, 2014, Takamol and Fullbridge executed a Master Agreement.  Trial Ex. 192 at 2.  Section 1.4 provided that "[t]his agreement will serve as a framework for the terms of each Work Order.  Each Work Order entered between the Parties will serve as a separate contract and will adopt the terms of this Agreement."  *Id.* at  5.

8.      The Agreement did not, by its terms, limit its application to Wave 1.  *Id.*; Tr. Day 4 (Mr. Olson) at 36:7-9, 77:21-78:6.  Fullbridge understood, rather, that the Agreement would govern all of its work for Takamol.  Tr. Day

---

[1] In Arabic, takamol means "integration."

3 (Mrs. Olson) at 71:15-24, 72:4-7.[2]   Takamol representatives and its attorneys told Peter Olson that the Agreement would cover all work going forward, including, as described below, Waves 2 and 3.  Tr. Day 4 (Mr. Olson) at 36:16-21.

9.     On November 2, 2014, Takamol issued a second Wave 2 RFP, to which Fullbridge again responded.  Trial Ex. 16.  Takamol selected Fullbridge as the winning bidder for Wave 2.  *Id.*

10.     On November 27, 2014, Ehab Albakri of Fullbridge sent an email to Khalid AlYousef and Nabil Tuker of Takamol containing the proposed pricing for Wave 2, which AlYousef accepted on behalf of Takamol in a return email the same day.  Trial Ex. 16.  Albakri understood Takamol's email as "confirming the awarding details and the agreed final price."  *Id.*

11.     The work orders from Waves 1 and 2 stated that they were "being executed pursuant to the [Master] Agreement . . . , the terms of which are being incorporated herein by reference."  Trial Exs. 193-196.

12.     Takamol had a practice of "perform[ing] now, paper[ing] later."  Tr. Day 3 (Mrs. Olson) at 80:15-19.  In other words, Takamol expected

---

[2] Ramon Rivera, Fullbridge's Chief Financial Officer (CFO) as of March 23, 2015, SOF ¶ 12, later referred to the Master Agreement in a May 9, 2016 email as the "Takamol *Wave 1* Master Agreement."  Trial Ex. 192 (emphasis added).

Fullbridge to begin working before a contract or work order was formally executed. Tr. Day 5 (Young) at 42:4-6.

13.     Fullbridge began work on Wave 1 before the Master Agreement was signed, relying on Takamol's "paper later" practice. Tr. Day 4 (Mr. Olson) at 75:3-11. Takamol verbally assured Fullbridge that the award had been granted, if not formally reduced to writing. Tr. Day 3 (Mrs. Olson) at 77:7-24.

14.     Fullbridge's work for Takamol on Wave 1 and Wave 2 proceeded without any red flags despite the unfinished formalities. Fullbridge began production in October of 2014 on a Wave 1 project that was completed in March of 2015, but was only "papered" in February of 2015. Tr. Day 3 (Mrs. Olson) at 80:1-19. Fullbridge began production on another Wave 1 project several months before it was papered on April 28, 2015. *Id.* at 80:24-81:19.

15.     Similarly, Fullbridge began working on Wave 2 projects due for completion in September of 2014 before being papered on August 20, 2014. Tr. Day 3 (Mrs. Olson) at 78:6-16.

### The Wave 3 Award

16.     On April 29, 2015, Takamol issued a third RFP. Trial Ex. 31. The Wave 3 RFP stated that the winning "[b]idder shall be notified in writing directly and solely by Takamol," and "shall sign a Framework Agreement

within the period so specified by Takamol." *Id.* § 7.14. The executive summary similarly provided that "Takamol will enter into 3-year framework agreements . . . with each successful Bidder." *Id.* § 1.

17.     On May 27, 2015, Fullbridge submitted a bid for the Wave 3 project. Trial Ex. 44.

18.     On August 17, 2015, Fullbridge employees Stephen Young (Relationship Manager) and Abeer AlHashimi (Chief Fullbridge Representative in the Middle East) met with Takamol's representatives Ghadeer Khali (Product Development), Fahad AlRabaa (Procurement Representative), and Tuker in Saudi Arabia to discuss the Wave 3 RFP, while Fullbridge's Peter Olson, Elena Butler (Vice President of International Business, and Caroline Young (Director of Product Development) participated in the meeting by phone. Tr. Day 4 (Mr. Olson) at 83:11-84:8-19.

19.     Khali informed Fullbridge that it had won a substantial share of the Wave 3 project and would be paid $40 million over three years. Tr. Day 4 (Mr. Olson) at 84:20-85:18, 86:10-19. More specifically, Khali and

AlRabaa stated that Takamol would purchase approximately 8,000 learning hours from Fullbridge capped at $4,800 per hour. *Id.* at 85:21-86:8.[3]

20.     In an August 17, 2015 email, Butler memorialized the "[t]op line" of the meeting by stating that it "went great – much better than we were expecting," and that they had reached "[h]igh level agreement on price with [the] promise of 8,000 learning hours volume at an average of $4,800" per learning hour for a total of "$40M [in] revenue over the next 3 years." Trial Ex. 70. Butler elaborated that "we will be the top vendor awarded . . . [and] will have the greatest scale if we reach an agreement on price." *Id.*

21.     In another August 17, 2018 email, Stephen Young, quoting from his meeting notes, stated that "Fullbridge [was] slated to be awarded a large portion of wave 3 families (highest among any bidder) pending final pricing offer," and that "[s]pecific details of how many courses [are] to be awarded and which families cannot be disclosed until an agreement on price is reached." Trial Ex. 71. Young also wrote that "[o]nce an agreement has been reached, it should take 2 to 3 weeks for necessary documents to be finalized / signed and course production can begin." *Id.* That same day, he followed

---

[3] Paraflon contends that these discussions are inadmissible hearsay statements, but the court ruled them admissible. *See, e.g.*, Tr. Day 4 at 85:7-8 ("It seems to me part of the verbal [contract]. I think it's admissible. Go ahead.").

up with Khali and AlRabaa about "reach[ing] an agreement in terms of pricing for wave 3 very soon." *Id.*

22. On August 18, 2015, AlHashimi sent an email to Rivera, among other Fullbridge employees, indicating that "initial feedback on the pricing we sent was good," and that Fullbridge expected to hear from Takamol "on the exact volume and families awarded in the next two days." Trial Ex. 74.

23. Fullbridge did not believe that a new Master Agreement had to be signed for Wave 3 since one already existed. Tr. Day 5 (Young) at 79:12-80:3.

24. Fullbridge, in sum, understood that it had agreed "on the price, on the number of hours, and the duration of three years; and that rested on top of a master contract, a master framework contract." Tr. Day 3 (Mrs. Olson) at 41:16-20. As Candice Olson noted in a September 16, 2015 email, "Takamol indicated that [Fullbridge had] won 40% of total $100mm Wave 3 project, or $40mm over 3 years" and that "[t]he contract is expected to begin in Q4, ramping up to full production by Q1." Trial Ex. 84.

25. Fullbridge and Takamol had not, however, agreed on the "second layer" of course details, namely which families of courses Takamol desired and the cost and duration of each course. Tr. Day 3 (Mrs. Olson) at 97:24-101:6.

26.     Fullbridge immediately began work on Wave 3 by, among other things, mapping out course hours, determining production time and the cost of each course, hiring translators and writers, and finding office space.  Tr. Day 3 (Mrs. Olson) at 86:12-87:20.

27.     By the summer of 2015, Fullbridge had been working with Takamol for a year and a half and had received over $5 million in payments. Tr. Day 3 (Mrs. Olson) at 91:13-21.  Since the spring of 2015, Stephen Young had been working in Takamol's offices in Saudi Arabia three or four days per week as the "go-to person" for technical issues.  Tr. Day 5 (Young) at 44:6-21.  He also helped find appropriate speakers, video productions, and actors with the appropriate Saudi dialect and accent.  *Id.* at 53:10-55:12.

28.     Fullbridge remained in regular contact with Khali about Wave 3 regarding, *inter alia*, video production locations, studio rentals, and hiring choices.  Tr. Day 4 (Mr. Olson) at 87:12-22; Tr. Day 3 (Mrs. Olson) at 44:8-14, 45:1-9.  Emails between Fullbridge and Takamol from June of 2015 onward discussed logistics, pricing, and families of courses for Wave 3.  Tr. Day 1 (Rivera) at 107:4-11.

29.     In September of 2015, Peter Olson instituted weekly meetings for Fullbridge's projects that AlHashimi participated in from Saudi Arabia by video.  Tr. Day 4 (Mr. Olson) at 91:7-15.  Each week, Peter Olson asked if it

was fair to represent to investors that Fullbridge had won the Wave 3 award, and AlHashimi repeatedly confirmed that the deal was still on.  *Id.* at 91:11-92:9.

30.    In January of 2016, Fullbridge invested in an apartment in Riyadh to house two of its employees.  Tr. Day 5 (Young) at 57:18-58:13.

*Fullbridge's Finances and Wave 3 Developments*

31.    At all relevant times, Fullbridge retained Bradley Woods & Co., Ltd., as its strategic and financial advisor in matters of raising capital, analyzing financial documents, creating financial, business, and strategic plans, and assembling and leading broker dealers and sales agents to place its securities offerings.  SOF ¶ 14.

32.    In a May 6, 2015 email to Rivera and Matthew Hanson of Global Silicon Valley Asset Management (GSV), Candice Olson revealed that Fullbridge's former CFO (not Rivera) had "sever[ly] damage[d]" the Company and that additional capital was needed to cover in the short-term.  Trial Ex. 36.

33.    In September of 2015, Fullbridge sought a $5 million loan from Horizon Technology Finance (Horizon), but Horizon first wanted "to see documentation of the Wave 3 award."  Trial Ex. 84.  In response, Rivera

drafted a non-binding confirmation dated September 14, 2015, which stated that:

> Fullbridge, Inc. was recently awarded, and pending final paperwork and final approval from the Takamol Procurement Department, a project of approximately 600 hours per quarter of a new development work.  The start of this project is contingent to all the customary and necessary final approvals on behalf of Takamol.  The duration of the project is uncertain but the expectation is that the project will last for about twelve consecutive calendar quarters.

Trial Ex. 83.

34.  On September 30, 2015, AlHashimi sent the proposed confirmation to Tuker seeking Takamol's signature.  Trial Ex. 86.  That same day, Tuker responded that he "reviewed[ed] the letter with legal and . . . can not sign it now."  *Id.*

35.  On October 29, 2015, Rivera sent an email to Hanson of Global GSV regarding the Horizon loan, stating that "it was best to set up the call after we receive some confirmation from Takamol Wave 3 (the $40MM project)."  Trial Ex. 106.

36.  In October of 2015, Fullbridge sought funding from Gulf Capital, but it too requested documentation of the Wave 3 award.  Trial Ex. 105.  In response, Matthew Calabro of Fullbridge replied that "[w]e will send Takamol's award confirmation when it is issued."  *Id.*

37.    In November of 2015, Rivera responded to Yvonne Zappulla, Managing Director at Bradley Woods (Fullbridge's financial advisor), SOF ¶ 16, about his efforts to obtain a confirmation from Takamol, Trial Ex. 111. Rivera stated that there was "[n]o proof whatsoever at this point. Unfortunately.  We have tried."  *Id.*

38.    On October 20, 2015, Peter Olson sent an email to Khaled AlGhoneim of Takamol stating that Fullbridge was "delighted to have been shortlisted as a course developer for the Wave 3 courses."  Trial Ex. 98.  He also noted that "Fullbridge ha[d] completed the planning and ground work required to set the stage for a development start as of October 1st," but was "waiting to move forward in finalizing the resources and infrastructure required pending the actual award of courses and a clear timetable for delivery."  *Id.*

39.    On October 22, 2015, AlGhoneim responded that Takamol was "delayed by issues outside of [its] control," and that while"[i]t seems that things are moving in the right direction," he could not provide a specific schedule.  Trial Ex. 98.

40.    On October 24, 2015, AlRabaa sent an email to AlHashimi, among others, informing her that Takamol was "still waiting for the management approval in this particular RFP."  Trial Ex. 100.  He also

suggested that a "buffer order . . . on a letter of intent [LOI] basis" as well as a "[f]ixed price agreement" could be arranged more easily in the interim. *Id.*

41.    AlHashimi discussed the email internally.  Rivera stated that AlHashimi should respond by summarizing the current situation, namely that Fullbridge "was awarded a portion of the final project," and "[t]hat the project [was] of a specific duration, in this particular case of three years" with the expectation of receiving "600 learning hours per quarter for the next 12 consecutive quarters."  Trial Ex. 100.  AlHashimi, in turn, noted that "[i]f we could get some courses now even if 200 LH [Learning Hours] or less with the LOI referring to remaining scope of wave 3 that should be a good step (compared to where we are now)."  *Id.*

42.    That same day, AlHashimi responded to AlRabaa that Fullbridge would be willing to accept Takamol's proposal if Takamol committed to the full scope of Wave 3, specifically a minimum of 7,200 learning hours with an average production of 600 hours per quarter.  Trial Ex. 101.

43.    On October 25, 2015, AlRabaa stated that Takamol could not "accept a minimum scale in this particular RFP."  Trial Ex. 101.  Fullbridge responded by agreeing to drop that condition and accepting the buffer order. *Id.*  Takamol, however, never issued the buffer order.  Tr. Day 2 (Rivera) at 107:11-23.

44. Rivera testified to his belief that these communications demonstrated that an "existing client was willing to work with us" and that they simply needed to finalize the details. Tr. Day 2 (Rivera) at 97:15-98:3.

45. An October 28, 2015 presentation to Fullbridge's board of directors stated that the Wave 3 award was "bumpier than hoped." Trial Ex. 103 at 7.

46. On November 26, 2015, Ruba Alyousfi of Takamol sent an email to Stephen Young informing him that "Fullbridge ha[d] reached the final stage for the issuance of the letter of award and subsequent agreement," but that to complete the arrangement, Fullbridge needed to accept a maximum of 3,000 learning hours, as opposed to the 8,000 originally contemplated for Wave 3. Trial Ex. 201.

47. Young forwarded the email to fellow Fullbridge employees, noting that the reduction in learning hours would decrease the value of the award from $40 million to $14.4 million. Trial Ex. 201. AlHashimi responded that she spoke with Khali who confirmed that "ALL outstanding payments will be received before [the] end of the year," and that "we have 300 LH ready to start immediately, [so] I guess we need that to be linked to the signing of the framework agreement which is in the hands of procurement." *Id.*

***Paraflon's Investments in Fullbridge***

48.     By 2015, Paraflon had made "[f]ive or six" investments, although none in the education sector.  Tr. Day 1 (Sarkesian) at 38:25-39:9.  Sarkesian was an experienced trader and had personally "invested in a variety of things."  *Id.* at 39:10-17, 68:14-17.

49.     On April 29, 2015, Sarkesian received Fullbridge's April 2015 investor presentation, which detailed, *inter alia*, Fullbridge's curriculum and business model as well as the biographies of the Olsons and the board of directors.  Trial Ex. 28.  At trial, Sarkesian could not identify any specific inaccuracies in the presentation.  Tr. Day 1 (Sarkesian) at 76:25-77:16.

50.     The April 2015 investor presentation, along with others, was prepared by Fullbridge employees, under the oversight of the Olsons.  Mr. Olson Dep. at 277:4-13.

51.     On May 6, 2015, Christopher Davis, the Managing Director at Founding Asset Management, Ltd., who had been hired by Fullbridge to seek out investors, SOF ¶ 13, sent offering documents to Sarkesian in connection with the "Series D Round," including a Confidential Private Placement Memorandum and an Investor Signature Package, *id.* ¶ 18; Trial Ex. 38.

52.     The following day, Paraflon executed the Series D Investor Signature Package, purchasing $500,000 worth of Series D Convertible Preferred Stock from Fullbridge.  SOF ¶ 18.

53.     On October 30, 2015, Davis sent an email to Sarkesian seeking his investment in the D-1 Round, stating that "Fullbridge is in real need of (at least) $3M to hire and build."  Trial Ex. 107.  Davis opined that "[w]ith healthy margins and a valuation of 2x expected 2016 revenue . . . plus anticipated growth as projected," "this is . . . a high quality investment with significant upside potential."  *Id.*

54.     Davis attached Fullbridge's October 2015 investor presentation, which stated that Fullbridge had "[l]arge, stable revenue," including a "$40mm share of Wave 3 of 21st century and vocational skill programs" from the "Saudi Labor Ministry."  Trial Ex. 107 at 30.

55.     On November 16, 2015, Davis sent Sarkesian a one-page "Qualitative High Level Summary" chart, which stated that Fullbridge had "recently won a large flywheel contract/award from KSA [Kingdom of Saudi Arabia], signaling large new pipeline fueling top-line growth over [the] next 2-3 years; 1Q 2016 alone should be over 50% of 2015 revenues."  Trial Ex. 118.

56.     Sarkesian reviewed the October 2015 investor presentation and the summary chart.  Tr. Day 1 (Sarkesian) at 44:22-45:4, 48:11-16.  He was primarily motivated to invest by the $40 million award from Takamol.  *Id.* at 51:7-24, 82:18-23.

57.     Sarkesian never asked to review documentation relating to the Wave 3 award, never spoke with anyone at Takamol about it, and never visited Fullbridge's data room.  Tr. Day 1 (Sarkesian) at 82:25-84:12.  Sarkesian testified, however, that he was never informed that the data room existed.  *Id.* at 65:13-23.

58.     The data room was accessible through a "website in the cloud."  Tr. Day 2 (Rivera) at 59:3-16.  It provided investors access to relevant contracts, agreements, and other documents related to Fullbridge's business over the past four to five years.  *Id.* at 59:11-16.  Rivera testified that had Sarkesian asked Fullbridge any questions, "we would [have been] more than happy to either correspond in person, via voice, or email," *id.* at 66:22-25, as Fullbridge did for other potential investors' inquiries, *see, e.g.*, Trial Exs. 105, 111.

59.     Sarkesian, in other words, trusted and relied upon Fullbridge's representations.  Tr. Day 1 (Sarkesian) at 50:10-51:5.  So, too, did Fullbridge

investors Alan Quasha, the former Chief Restructuring Officer, and Hanson of GSV.  Tr. Day 4 (Quasha) at 9:17-10:9; Hanson Dep. at 246:2-11.

60.    On November 19, 2015, Davis sent Sarkesian the Fullbridge offering documents in connection with the Series D-1 Round, including a Confidential Private Placement Memorandum and an Investor Signature Package.  SOF ¶ 20.

61.    Sarkesian read and signed the Memorandum, after Paraflon's counsel reviewed it.  Tr. Day 1 (Sarkesian) at 84:13-85:2; Trial Ex. 122.  The Memorandum recited, among other things, that Sarkesian had "received all the information that [Paraflon] had requested relating to [Fullbridge] and the purchase of the Securities;" that Paraflon "has had an opportunity to ask questions and receive answers from [Fullbridge] regarding the terms and conditions of the Offering of the Securities;" that Paraflon "is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself and has such knowledge and experience in financial or business matter that it is capable of evaluating the merits and risks of the investment in the Series D-1 Preferred Stock;" and that Paraflon "is able to bear the economic risk of such investment and, at the present time, is able to afford a complete loss of such investment."  Trial Ex. 121 §§ 3.3-3.4.

62.    In Exhibit D, Fullbridge identified, and Sarkesian similarly acknowledged, the risk factors associated with the D-1 investment, including that Fullbridge had "a history of loss, and [] may be unable to attain profitability," "ha[d] experienced net losses in each year from [its] inception in 2010 through the year ended December 30, 2014," and that it was "an early stage company with a limited operating history, which makes it difficult to evaluate [its] current business and future prospects and may increase the risk of [the] investment." Trial Ex. 121, Ex. D.

63.    On November 20, 2015, Paraflon purchased an additional $750,000 worth of Series D-1 Convertible Preferred Stock from Fullbridge. SOF ¶ 21.

64.    On November 23, 2015, Sarkesian approved the executed purchasing documents, which were then sent to Davis. Trial Exs. 126-127.

65.    On December 1, 2015, Paraflon wired the purchase funds for the Series D-1 shares. SOF ¶ 22.

66.    The Olsons did not personally invest in the D-1 Round. Tr. Day 1 (Sarkesian) at 59:1-3.

67.    In early 2016, Sarkesian learned that Fullbridge had encountered financial problems and was considering placing itself on the market. Tr. Day 1 (Sarkesian) at 55:1-11.

68.    Candice Olson acknowledged, in an April 19, 2016 email, that "[e]verything we are experiencing ties back to loss of [the] $40mm award which we anticipated providing revenue to allow us to successfully diversify both geographically and with new scalable products.  If this award had not been delayed, we would have raised the capital to sustain company as we made these transitions."  Trial Ex. 190.  The $40 million award would have been, by far, the largest contract Fullbridge had ever been awarded.  Mrs. Olson Dep. at 140:10-17.

69.    Later in 2016, Sarkesian demanded without success that Fullbridge return Paraflon's investment.  Tr. Day 1 (Sarkesian) at 64:19-65:3.

70.    On June 7, 2016, Quasha sent an email to Sarkesian, writing:

> I can assure you that I sympathize totally with your strong feelings of being wronged. . . .  It seems hard to believe that Peter and Candice were not fraudsters.  Thus, they should be punished, and it is a travesty of justice if they get away scot free.  Exactly how I personally feel. You and I will likely never know the truth. I don't know where I come out.  I do know that Candice and Peter were terrible stewards of other people's money, that they misspent large amounts of money which we can never get back, that they were incompetent in managing [Fullbridge], and that they ruined the company.

Trial Ex. 181.  He further opined regarding the D-1 Round that "while [Fullbridge's] actions seems [sic] somewhat convoluted and perhaps gave the impression of acting in bad faith, it was very likely acting within its legal rights, and a lawsuit by you on these issues is likely a dead end."  *Id.*

71.     Quasha testified that, based on a report prepared by Fullbridge's law firm, Burns & Levinson LLP, regarding Sarkesian's demands, he had concluded that the claims were not valid.  Tr. Day 4 (Quasha) at 27:24-28:17.

72.     On June 26, 2016, Quasha sent another email to Sarkesian, stating that "the Board was duped by the Olsons as everyone else," and that "[i]t is difficult to mistrust what the CEO is telling you, and the Olsons were touting these big Saudi contracts right up to 2016."  Trial Ex. 197.

***This Litigation***

73.     On July 18, 2016, Paraflon initiated this lawsuit against Fullbridge and the Olsons, among other defendants.[4]  The Complaint set out five claims: violations of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count I), as well as Section 20(a) (Count II), and common-law claims of fraudulent misrepresentation and concealment (Count III), breach of contract (Count IV), and negligent misrepresentation (Count V).

74.     On February 14, 2019, the fourth day of the bench trial, the court allowed judgment as a matter of law on the breach of contract claim (Count

---

[4] The remaining defendants – Fullbridge directors Edward J. Mathias, David Wong, and Michael Moe – were voluntarily dismissed on May 30, 2018.  Dkt # 83.

IV) under Rule 50(a) of the Federal Rules of Civil Procedure because "there [was] no showing of [contractual] damages." Tr. Day 4 at 117:5-11.

75. On June 5, 2019, the court ruled that New York law applied to Paraflon's remaining state-law claims, Counts III and V. Dkt # 109.

76. At the heart of its Complaint, Paraflon contends that the October 2015 investor presentation's reference to the $40 million Wave 3 award (that never materialized) was false because, among other things, Fullbridge had not, at the time, executed a formal agreement with Takamol nor had it received, and in fact had been twice refused, a written confirmation of the award. Paraflon further contends that on November 26, 2015, five days before wiring its funds, Fullbridge learned, and had a duty to disclose, that the Wave 3 RFP had been reduced to $14.4 million.

## RULINGS OF LAW

1. To state a claim under Section 10(b) of the Securities Exchange Act of 1934, Paraflon must demonstrate "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). More specifically,

    a. Paraflon "must show 'that defendants made a materially

false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'" *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 454 (1st Cir. 2017), quoting *Geffon v. Micrion Corp.*, 249 F.3d 29, 34 (1st Cir. 2001). "A fact is material when there is 'a substantial likelihood' that a reasonable investor would have viewed it as 'significantly alter[ing] the total mix of information made available.'" *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015) (citations omitted). Whether a statement or omission is materially misleading is determined at the time the statement is made. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008).

b. "Scienter is defined as either the 'intentional or willful conduct designed to deceive or defraud investors' or 'a high degree of recklessness.'" *Metzler Asset Mgmt. GmbH v. Kingsley*, 2019 WL 2635619, at *5 (1st Cir. June 27, 2019), quoting *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017). "That degree of recklessness demands 'a highly unreasonable omission,' one that not only involves 'an extreme departure from the standards of ordinary care,' but also 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'"

*Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 37 (1st Cir. 2017) (citations omitted). Good faith, however, is a defense to scienter because "defendant[s] cannot intend to deceive if [they] acted in good faith." *Backman v. Polaroid Corp.*, 893 F.2d 1405, 1418 (1st Cir. 1990).

        c.    Paraflon must show that it "justifiably relied" on defendants' representations. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987). The court looks to a number of factors to determine if reliance is justified, including "(1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations." *Id.* (citation omitted); *see also Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.").

2. Section 20(a) of the Securities Exchange Act of 1934 "creates

*derivative* liability for those that directly or indirectly control a person or firm found liable under a provision of the Securities Exchange Act." *Credit Suisse First Bos. Corp., In re*, 431 F.3d 36, 53 (1st Cir. 2005) (emphasis added). Thus, a dismissal of Paraflon's Section 10(b) claim would necessitate dismissal of its Section 20(a) claim as well. *See Ganem*, 845 F.3d at 453 n.4.

3. "Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). A cause of action for fraudulent concealment further requires that "the defendant had a duty to disclose material information and that it failed to do so." *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 250 (2003) (citation omitted). Such a duty arises where a defendant "has made a partial or ambiguous statement," if a fiduciary or confidential relationship exists between the parties, or when "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). More specifically,

a.  "The clear and convincing evidence standard is satisfied when the party bearing the burden of proof has established that it is highly probable that what he or she has claimed is actually what happened." *Home Ins. Co. of Indiana v. Karantonis*, 550 N.Y.S.2d 77, 79 (1989).

b.  Paraflon "cannot demonstrate reasonable reliance without making inquiry and investigation if [it] has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment." *Crigger*, 443 F.3d at 234. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Id.* at 235, quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984).

c.  "[A]llegations of fraudulent misrepresentations and omissions which occurred after [the plaintiff] made investments . . . may not form the basis for the plaintiff's fraud claims to the extent that they were made after any such investment, since the element of reliance is necessarily absent." *High Tides, LLC v. DeMichele*, 931 N.Y.S.2d 377, 381 (2011).

4. "Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). More specifically,

    a. "[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996). "In order to establish a special relationship, a plaintiff must show that their relationship with defendant was 'sufficiently close that it approaches privity.'" *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 500 (S.D.N.Y. 2018) (citation omitted). "The special relationship requires a closer degree of trust than that in an ordinary business relationship." *Wey v. New York Stock Exch., Inc.*, 841 N.Y.S.2d 222

(Sup. Ct. 2007) (Table). "[C]orporate officers and directors . . . owe a fiduciary duty to . . . shareholder[s]." *Quasha v. Am. Nat. Beverage Corp.*, 567 N.Y.S.2d 257, 257 (1991), citing *Giblin v. Murphy*, 73 N.Y.2d 769, 771 (1988).

b. "An essential element of both fraud and negligent misrepresentation is that the defendant knew or should have known that its statements were false at the time they were made." *IP Cube Partners Co. v. Telecomm. Sys., Inc.*, 2016 WL 3248500, at *2 (S.D.N.Y. June 13, 2016).

c. "[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d Cir. 2012), quoting *UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dep't 2001).

## ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW

1.      The reference to a $40 million Wave 3 award from Takamol in Fullbridge's October 2015 investor presentation, Findings of Fact (FOF) ¶ 54, was not materially false or misleading because, by October of 2015, Fullbridge had received numerous assurances from Takamol that the award was forthcoming, assurances that it relied upon in good faith, given the established working relationship that it had with Takamol, *see ACA Fin. Guar. Corp.*, 512 F.3d at 62; *IP Cube Partners Co.*, 2016 WL 3248500, at *2. More specifically,

a.      In August of 2015, Takamol representatives informed Fullbridge that it had won a $40 million three year Wave 3 contract to provide 8,000 learning hours capped at $4,800 per hour.  FOF ¶ 19. In September of 2015, Takamol several times confirmed that the deal was still on.  *Id.* ¶¶ 28-29*.*  And in October of 2015, Takamol acknowledged that despite a delay, the Wave 3 RFP was "moving in the right direction" and simply awaiting management approval.  *Id.* ¶¶ 39-40.  Fullbridge, in other words, understood that Takamol had agreed on the overall price, hours, and duration for Wave 3, although not the content of each individual course.  *Id.* ¶¶ 20-25.

b.      While Paraflon is correct that Fullbridge had neither executed a formal agreement for Wave 3 as the RFP indicated nor had it received, after twice requesting, a written confirmation of the award, FOF ¶¶ 16, 33-37, Fullbridge understood – based on its year and half experience of working with Takamol and its staff in Takamol's offices in Saudi Arabia – that the Master Agreement would govern its work for Wave 3, as it had for Waves 1 and 2, *id.* ¶¶ 7, 11, 23-24, 27-29.  Takamol representatives had told Peter Olson that such would be the case.  *Id.* ¶ 8.  AlHashimi's November 26, 2015 email suggesting that a new framework agreement would be necessary for Wave 3, *id.* ¶ 47, does not affect the veracity of the October 2015 investor presentation, which predated the email, *see High Tides*, 931 N.Y.S.2d at 381.

c.      Fullbridge also understood that Takamol had an unofficial policy of expecting "performance first and paper later."  FOF ¶ 12-15.  That had been Fullbridge's experience with the predecessor Wave 1 and Wave 2 projects.  *Id.*

2.      Defendants did not act with the intent to deceive or with reckless disregard for the truth.  *See Kingsley*, 2019 WL 2635619, at *5.  Rather, in October of 2015, defendants reasonably believed, and had a good faith basis for representing, that Fullbridge had been awarded $40 million of business

over three years from Takamol. *See Backman*, 893 F.2d at 1418. While there may have been a heaping ration of wishful thinking on the table, the communications of Fullbridge representatives at the time with the home office and their credible testimony at trial reveal a sincerely held belief, shared by all of the Fullbridge principals concerned, that they would receive the award, FOF ¶¶ 19-24, 29, 41, 44, 68, notwithstanding the delay in receiving written confirmation, *id.* ¶¶ 34, 37, 39-40. Furthermore,

a.	The fact that Fullbridge was struggling financially, FOF ¶¶ 4, 32-33, 36, 62, 67-68, 70, does not support an inference that it purposefully or recklessly misled investors about the $40 million award to induce them to invest.

b.	To the contrary, Fullbridge itself acted from August through November of 2015 consistently with the belief that it would receive the $40 million award from Takamol. FOF ¶¶ 24, 41, 44. Its staff had begun mapping course hours, hiring translators and writers, and discussing logistics. *Id.* ¶ 26-28. Fullbridge went so far as to invest in staff accommodations in Saudi Arabia in January of 2016. *Id.* ¶ 30.

3.	The $40 million award was material to Paraflon's decision to invest in Fullbridge. FOF ¶ 56.

4.     Although Fullbridge did not disclose to Paraflon the November 26, 2015 email from Takamol reducing Fullbridge's share of the Wave 3 award, FOF ¶¶ 46-47, the omission could not have affected Paraflon's decision to invest in the Series D-1 shares a month prior to the email.  While the funds were wired on December 1, 2015, Paraflon had purchased the stock on November 20, 2015, and had executed the purchase agreement on November 23, 2015.  *Id.* ¶¶ 63-65.  Thus, even assuming that defendants had a duty to disclose the reduction in the award after the purchase, *see Quasha*, 567 N.Y.S.2d at 257; *Brass*, 987 F.2d at 150; *Kimmell*, 89 N.Y.2d 257, 263 (1996), that disclosure had no bearing on Paraflon's initial decision to invest in Fullbridge, *see High Tides*, 931 N.Y.S.2d at 381.

5.     Absent a showing of a materially false or misleading statement and the requisite scienter, Paraflon's claims are not viable.  Specifically,

a.     Paraflon's Section 10(b) claim (Count I) fails because Fullbridge's statement regarding the $40 million award was not false when it was made, *see Ganem*, 845 F3d at 454; *ACA Fin. Guar. Corp.*, 512 F3d at 62, and moreover, defendants lacked the necessary scienter (intent or recklessness), *see Kingsley*, 2009 WL 2635619, at *5.  In addition, since defendants reasonably believed that the award would

come to fruition, the good faith defense prevails.  *See Backman*, 893 F.2d at 1418.

b.      Having dismissed the Section 10(b) claim, the court must necessarily dismiss Paraflon's Section 20(a) claim (Count II) as well. *See Ganem*, 845 F.3d at 453 n.4.

c.      Paraflon's fraudulent misrepresentation and concealment claim (Count III) similarly fails because defendants did not knowingly or intentionally make a false statement.  *See Crigger*, 443 F.3d at 234; *P.T. Bank Cent. Asia*, 754 N.Y.S.2d at 250.

d.      Finally, Paraflon's negligent misrepresentation claim (Count V) fails because, once again, the statement about the $40 million award was not false nor should defendants have known it to be inaccurate at the time it was made.  *See Hydro Inv'rs*, 227 F.3d at 20; *IP Cube Partners Co.*, 2016 WL 3248500, at *2.[5]

## ORDER

The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[5] Given its conclusion, the court need not reach the issue of whether Paraflon reasonably relied on the statement or suffered damages as a result. Nor need the court reach the issue of whether a special or fiduciary relationship existed between Paraflon and defendants.